# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                No. CR 14-3347 JB

DAVID W. WELBIG,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Objections to Presentence Report (PSR), filed March 6, 2015 (Doc. 18)("Objections"). The Court held a hearing on April 14, 2015. The primary issues are: (i) whether Plaintiff United States of America has presented sufficient evidence to support a finding by a preponderance of the evidence that Defendant David W. Welbig intended to steal a $50,000.00 check; (ii) whether Welbig used his special accounting skills to carry out his embezzlement scheme; and (iii) whether Welbig obstructed justice by fleeing from law enforcement authorities and assuming an alias for over twenty years. Because the United States has not presented sufficient evidence showing that Welbig intended to steal the $50,000.00 check, the Court will sustain Welbig's objection to the inclusion of that amount in its total loss calculation. Welbig used his accounting skills to enact his scheme, and the Court will, thus, apply the United States Sentencing Guidelines' special-skills enhancement. Finally, fleeing or avoiding arrest does not constitute obstruction of justice. The Court will, accordingly, sustain Welbig's objection to the obstruction-of-justice enhancement. Consequently, the Court will overrule the Objections in part and sustain them in part.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed November 25, 2014, revised March 31, 2015 ("PSR"), which the United States Probation Office ("USPO") prepared.   Computerized Quality Graphics/Commodity Quote Graphics ("CQG") employed Welbig as a certified public accountant ("CPA") in Glenwood Springs, Colorado.  PSR ¶ 6, at 3. In 1989, Welbig attempted to open a personalized account through a brokerage company that CQG used.  See PSR ¶ 6, at 3.  Welbig provided the brokerage company with a $50,000.00 check from CQG to open the account; however, Welbig was not authorized to open an account using CQG's funds.  See PSR ¶ 7, at 3.  The brokerage company denied Welbig's request to open an account and contacted CQG's president to inform him of Welbig's actions.  See PSR ¶ 7, at 3.  CQG voided the check.  See PSR ¶ 7, at 3.  CQG fired Welbig and hired an outside agency -- Dalby Wendland & Co. -- to conduct an audit.  See PSR ¶ 7, at 3.

Dalby Wendland's audit discovered a scheme by Welbig that, from May 12, 1989, to November 20, 1989, resulted in the California, Illinois, and New York taxing authorities issuing seven checks, totaling $35,904.67.  See PSR ¶ 7, at 3.  Welbig advised the California, Illinois, and New York taxing authorities that he anticipated that CQG would have a tax liability in each state and that CQG would deposit checks in anticipation of the tax liability.  See PSR ¶ 8, at 3.  It was common practice for CQG to deposit checks with state taxing authorities in anticipation of a tax liability.  See PSR ¶ 8, at 3.  Welbig issued two checks -- totaling $10,000.00 -- to the California State Franchise Tax Board, two checks -- totaling $5,000.00 -- to the Illinois Department of Revenue ("IDR"), and three checks -- totaling $20,904.67 -- to the New York State Income Tax Board.  See PSR ¶¶ 9-11, at 4.  Later, Welbig informed each state's taxing authority that CQG did not have the anticipated tax liability and requested a refund.  See PSR

¶ 12, at 4.   While requesting a refund is not uncommon for CQG, Welbig gave the taxing authorities his personal information, rather than CQG's information.   See PSR ¶ 12, at 4.   Each state sent Welbig checks for the refund, which he deposited into his personal bank account.   See PSR ¶¶ 13-15 at 4.   The PSR states that, in total, Welbig attempted to fraudulently obtain $85,904.67 -- $50,000.00 from attempting to open a personal trading account and $35,904.67 through his tax-refund scheme.   See PSR ¶ 16, at 5.

On April 16, 1990, a Federal Bureau of Investigation ("FBI") agent contacted Welbig and made an appointment to interview him about his involvement in the tax-refund fraud scheme.   See PSR ¶ 17, at 5.   Welbig told the agent that he was available for an interview on April 18, 1990.   See PSR ¶ 17, at 5.   Welbig did not show up for the interview, so the agent called Welbig's wife, who denied any knowledge of the interview and told the agent that she thought Welbig was in Aspen, Colorado, to do tax work for a friend.   See PSR ¶ 17, at 5.   Welbig's wife contacted the FBI later that day, telling them that, when she arrived home, she found a letter from Welbig that stated: "FBI called - CQG going to file charges.   I can't handle that.   Love Always."   PSR ¶ 18, at 5.   On April 23, 1991, the United States District Court for the District of Colorado issued a warrant for Welbig's arrest.   See PSR ¶ 19, at 5.

Welbig traveled to California, where he obtained the death certificate of John Dolan.   See PSR ¶ 19, at 5.   Welbig began using the alias "John Dolan," and a different date of birth and Social Security number.   PSR ¶ 19, at 5.   On August 10, 2010, the National Passport Center ("NPC") received a passport application from Welbig, using the alias John Dolan.   PSR ¶ 20, at 5.   The NPC conducted an audit and discovered that the real John Dolan died in 1986.   See PSR ¶ 20, at 5.   The NPC discovered that five passports had been issued to John Dolan, two of

which were valid, and three of which were fraudulent and had been issued to Welbig in 1990, 2000, and 2010.  See PSR ¶ 20, at 5.

On July 22, 2014, special agents from the Phoenix Resident Office of the Diplomatic Security Service arrived at Welbig's residence in Albuquerque, New Mexico.  See PSR ¶ 21, at 5.  The agents questioned Welbig about his involvement in passport fraud, and Welbig admitted that he obtained a copy of John Dolan's death certificate, and used the information from the death certificate to secure a birth certificate, Social Security card, and state identification card.  See PSR ¶ 21, at 5.  Welbig provided the agents with his real name and told them that he had been on the run for over two decades, because he was wanted by the FBI for embezzlement. See PSR ¶ 21, at 5.

## PROCEDURAL BACKGROUND

Welbig was indicted in the District of Colorado for fraudulently transferring funds.  See Indictment at 1-2, filed in the District of Colorado on April 23, 1991, filed in the District of New Mexico on July 23, 2014 (Doc. 1)("Indictment").  The Indictment alleges that Welbig embezzled $35,904.67 through his tax-refund scheme and does not mention the $50,000.00 check.  See Indictment at 1-2.  The case was transferred to the District of New Mexico on September 30, 2014.  On October 10, 2014, Welbig pled guilty to the Indictment's charges.  See Plea Minute Sheet at 1, filed October 10, 2014 (Doc. 13).

1.       **The PSR, Objections, and Addendum.**

The USPO disclosed the PSR on November 25, 2014, and revised it on March 31, 2015. The PSR notes that the base offense level for an 18 U.S.C. § 2314 violation is 4 under U.S.S.G. § 2B1.1.  See PSR ¶ 30, at 12.  It notes that, because Welbig's intended loss was more than $70,000.00, 8 additional levels are applied under § 2B1.1(1)(G).  See PSR ¶ 31, at 12; id. ¶ 16,

at 5 (stating that "Welbig attempted to fraudulently obtain $85,904.67").  The PSR applies an additional 2-level enhancement under U.S.S.G. § 3B1.3, because Welbig held and abused a special skill.  See PSR ¶ 33, at 12.  The PSR also applies a 2-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice, because Welbig assumed a different identity, which caused the FBI to expend resources trying to catch him for over twenty years, including annual contacts with his family members and acquaintances.  See PSR ¶ 35, at 13.  The PSR applies a 2-level reduction under U.S.S.G. § 3E1.1(a) for clearly demonstrating an acceptance of responsibility and a 1-level reduction under § 3E1.1(b) for timely notifying authorities of an intent to plead guilty.  See PSR ¶¶ 38-39, at 13.  The PSR calculates Welbig's total offense level as 13.  See PSR ¶ 40, at 13.  The PSR states that Welbig has a criminal history score of 2 from pleading guilty to aggravated identity theft, which results in a criminal history category of II.[1]  See PSR ¶¶ 44-46, at 14; United States v. Welbig, No. CR 14-3764 JB.  The PSR notes that the Guidelines range for an offense level of 13 and a criminal history category of II is 15- to 21-months imprisonment.  See PSR ¶ 83, at 21.

Welbig filed his Objections on March 6, 2015.  Many of Welbig's objections concern factual statements or errors within the PSR that do not affect his Guidelines calculation.  See Objections ¶¶ 1-7, at 1-2 (objecting to, among other things, the date his warrant was issued, the date of birth he used for his alias, and the name of the company from which he embezzled money).  Welbig also objects to the inclusion of the $50,000.00 check in calculating the amount of loss that he intended to cause.  See Objections ¶ 8, at 2.  He argues that, while he admits to fraudulently obtaining checks totaling $35,904.67, "the $50,000.00 check was of a different class

---

[1]The originally disclosed PSR stated that Welbig had a criminal history category of I. Between the time in which the USPO prepared the original PSR and the revised one, Welbig plead guilty in his identity-theft case.

and character." Objections ¶ 8, at 2.  Welbig asserts that CQG issued the $50,000.00 check at his behest and that the check was a part of a legitimate business transaction.  See Objections ¶ 8, at 2.  He contends that, in issuing the check, he merely exceeded his authority under CQG's corporate structure.  See Objections ¶ 8, at 2.  Welbig maintains that the $50,000.00 check did not involve any fraudulent conduct, and that it was sent to a brokerage firm at which CQG had four or five existing accounts.  See Objections ¶ 8, at 2-3.  He states that it was to be deposited so that he could buy and sell in commodities, and that he was fired, because he did not seek proper approval from CQG's president/CEO.  See Objections ¶ 8, at 3.

Welbig also argues that the special-skill enhancement should not apply, because, although he was a CPA when he worked at CQG, he did not use his special skill to fraudulently obtain the tax refunds.  See Objections ¶ 10, at 3.  He contends that his scheme was so simple and straightforward that any CQG employee could have pulled it off without using any special skills, such as a CPA degree or license.  See Objections ¶ 10, at 3.  Finally, Welbig argues that the obstruction-of-justice enhancement should not apply, because avoiding or fleeing from arrest is excluded as a basis for the enhancement.  See Objections ¶ 11, at 3.

The USPO issued an addendum to the PSR in response to Welbig's Objections.  See Addendum to the Presentence Reports, disclosed March 31, 2015 ("Addendum").  Concerning the $50,000.00 check, the Addendum states that § 2B1.1(b)(1)(G) considers the amount of actual or intended loss, whichever is greater.  See Addendum at 2.  The Addendum notes that Welbig initially told the brokerage company that he wanted to open a personal account with $10,000.00 and that he wanted to go through a broker, other than CQG, to keep his trading private.  See Addendum at 2-3.  The Addendum states that Welbig sent the brokerage company the $50,000.00 check with a note stating that he decided to put more money in the account and that

he asked CQG to purchase a sixty-day treasury bill with $20,000.00.  See Addendum at 3.  The Addendum states that Welbig further stated that he would leave the money in the account for now, but that he might use it for another transaction.  See Addendum at 3.  The Addendum notes that the brokerage firm discovered that Welbig was not authorized to open an account with CQG funds.  See Addendum at 3.  It states that Welbig's termination led to the discovery of Welbig's tax-refund scheme and that, although the $50,000.00 was a different activity than the tax fraud, it still involved an attempt to embezzle $50,000.00 from CQG.  See Addendum at 3.  The Addendum states that, because the $50,000.00 check and the tax refunds are part of the same scheme, the check is attributable to Welbig as relevant conduct.  See Addendum at 3.

The Addendum addresses Welbig's special-skill objection by stating that Welbig was CQG controller, who would instruct the corporate secretary to prepare checks on behalf of CQG and that each check required the secretary's and Welbig's signature.  See Addendum at 3-4.  The Addendum notes that, in April, 1989, and May, 1989, the State of Illinois received two tax-voucher forms with checks and that each form had Welbig's information on it.  See Addendum at 4.  The Addendum states that, in January, 1990, Welbig sent the State of Illinois a tax form that showed no income and requested Illinois to return the $5,000.00 that was sent with the tax-voucher forms.  See Addendum at 4.  The Addendum notes that the tax form "included the U.S. 1040, and a Schedule A, B and E," and that each document was required for Welbig to receive the refund.  Addendum at 4.  The Addendum states that the IDR's Legal Division "favors the information furnished on the 1040-ES forms and not the source of the payment itself," which means that "no particular attention is made to the payee in comparison to the original funds provided."  Addendum at 4.  The Addendum notes that New York and California follow similar processes.  See Addendum at 4.  The Addendum further notes that, because of Welbig's position

and skills, he was aware of the tax laws and the proper procedures that he needed to successfully complete the reimbursement process and have the checks issued to himself without suspicion. See Addendum at 4.  It states that, because of Welbig's position, he was able to instruct a colleague to draft and sign the checks to carry out his scheme.  See Addendum at 4.

Concerning the obstruction-of-justice enhancement, the Addendum states that Welbig was a fugitive for over twenty years, which resulted in the FBI expending resources to find him. See Addendum at 4.  It states that Welbig not only became a fugitive, he assumed a new identity, date of birth, Social Security number, and identification to evade arrest.  See Addendum at 4. The Addendum notes that Welbig's actions resulted in the evasion of his prosecution.  See Addendum at 4.

### 2.   The April 14, 2015, Hearing.

The Court held a hearing on April 14, 2015.  See Transcript of Hearing (taken April 14, 2015)("Tr.").[2]  In addressing the $50,000.00 check, the Court told the parties that Welbig's objection was unclear, because loss is determined by either actual loss or intended loss.  See Tr. at 2:18-21 (Court).  Welbig argued that he did not intend to embezzle the $50,000.00 and, if there is no intent to embezzle, there is no intended loss.  See Tr. at 2:22-15 (Keefe).  He contended that, without the $50,000.00 check, the total loss should be around $35,000.00.  See Tr. at 3:15-17 (Keefe).  Welbig argued that the United States does not have any evidence showing intent, which means that it failed to show by a preponderance of the evidence that the $50,000.00 should be considered intended loss.  See Tr. at 3:18-4:3 (Keefe, Court).

The United States responded by stating that the case is twenty-four years old and that it could not locate the FBI agents who originally investigated the case.  See Tr. at 4:6-10 (Cairns).

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

It said that, while the $50,000.00 check "may have been fraud, . . . it would have been a different kind of fraud" than that with which the Indictment charges Welbig.  <u>See</u> Tr. at 4:13-16 (Cairns). The United States conceded that it had no evidence to present on intent, which would imply that it failed to meet its burden of proof.  <u>See</u> Tr. at 4:16-18 (Cairns).

Concerning the special-skills enhancement, Welbig argued that the Addendum and the PSR seem to address an abuse-of-position enhancement more than a special-skills enhancement. <u>See</u> Tr. at 4:23-5:10 (Keefe).  He maintained that, while he was a CPA and had worked as a controller, like the $50,000.00 check, the United States did not have evidence showing that he abused his position or used special skills.  <u>See</u> Tr. at 5:11-15 (Keefe).

The United States responded by arguing that it did not have direct evidence to present at the hearing and that the law is somewhat confusing in that area.  <u>See</u> Tr. at 5:18-20 (Cairns).  The United States contended that the Court has the records that it provided to the USPO and that those records "speak for themselves so that the Court is well aware of what happened."  Tr. at 6:21-25 (Cairns).  The United States referred to <u>United States v. Edwards</u>, 325 F.3d 1184 (10th Cir. 2003), where, it asserts, the district court applied the abuse-of-position enhancement but the United States Court of Appeals for the Tenth Circuit reversed.  <u>See</u> Tr. at 5:21-6:12 (Cairns). The United States asserted that <u>United States v. Edwards</u> suggests that Welbig's accounting skills would not be considered a special skill.  <u>See</u> Tr. at 6:9-12 (Cairns).  The Court told the United States that <u>United States v. Edwards</u> was an abuse-of-trust case and not a special-skills one.  <u>See</u> Tr. at 7:12-14 (Court).  The United States maintained that Welbig's conduct seemed to fit the enhancement, but that it did not have any evidence to present at the hearing.  <u>See</u> Tr. at 8:6-10 (Cairns).

Addressing the obstruction-of-justice enhancement, Welbig argued that Application Note 5(D) to § 3C1.1 states that avoiding or fleeing from arrest is not obstruction of justice, which is what happened in this case. See Tr. at 12:16-22 (Keefe). He contended that, immediately after the FBI sought him, he fled from Colorado and changed his name to avoid arrest. See Tr. at 12:23-13:1 (Keefe). Welbig argued that the Application Note did not except lengthy avoidances, causing his case to fall within the Application Note's exclusion. See Tr. at 13:1-7 (Keefe). The United States responded by agreeing with Welbig that the Application Note does not contain a time limit and by stating that, while Welbig assumed another identity, he is being punished for that conduct in another case. See Tr. at 13:10-16 (Cairns).

The Court overruled Welbig's special-skills objection, see Tr. at 9:11-12:10 (Court), and sustained his objection to the obstruction-of-justice enhancement, see id. at 13:20-17:24 (Court). The Court took Welbig's objection to the $50,000.00 check under advisement and said it would sentence Welbig at a later date. See Tr. at 18:15-21 (Court).

### 3.     The United States' Memorandum.

On April 15, 2015, the United States filed The Government's Memorandum on the Defendant's Objection to the Presentence Report's Finding of Intended Loss and the Government's Sentencing Memorandum, filed April 15, 2015 (Doc. 27)("U.S. Memo."). In addressing the intended loss, the United States notes that the USPO included the $50,000.00 check in Welbig's intended loss, even though the Indictment did not include the check. See U.S. Memo. at 5. It states that Welbig has not been convicted or charged with any offense related to the $50,000.00 check. See U.S. Memo. at 5. The United States asserts that relevant conduct must be criminal or unlawful. See U.S. Memo. at 5-6. The United States concedes that it is unclear, from the FBI reports, what Welbig intended to do with the $50,000.00. See U.S. Memo

at 6.  It contends that an inference may be drawn from the brokerage officials' statements that Welbig intended to spend the money, but notes that, unlike the other thefts, Welbig did not deposit the money into his personal bank account.  See U.S. Memo. at 6.

The United States says that it is peculiar that Welbig would go through the trouble of arranging the tax refunds if he could have simply written checks to himself from CQG's account. See U.S. Memo. at 6.  The United States contends that the charged thefts are fairly sophisticated, while the $50,000.00 check lacked any sophistication, even though it involved a larger sum of money.  See U.S. Memo. at 6.  The United States asserts that, with Welbig's education and experience, he would likely know that CQG would not overlook the $50,000.00 loss, which explains why he engineered the tax-refund scheme for the other thefts.  See U.S. Memo. at 6. The United States also contends that it is unclear what kind of account Welbig attempted to open.  See U.S. Memo. at 6.

The United States notes that the bald nature of the $50,000.00 check, the dissimilarities between the check and other thefts, and the fact that no criminal charges were filed for the check "leaves open the possibility that this transaction was a misunderstanding between Welbig and the company as to his authority."  U.S. Memo. at 7.  "At most," the United States notes, "it seems an unclever theft committed by a clever man."  U.S. Memo. at 7.  It states that, while the Court may find the misunderstanding explanation "disingenuous," the United States has the burden of proving that the $50,000.00 check constituted an unlawful act.  U.S. Memo. at 7.  The United States conceded that it "has no evidence to prove, by a preponderance of the evidence, that the attempted opening of the trading account constitutes a criminal offense under federal or states law."  U.S. Memo. at 7.

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory. See 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in § 3553(a)(2):

> **(A)**　　to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**　　to afford adequate deterrence to criminal conduct;
>
> **(C)**　　to protect the public from further crimes of the defendant; and
>
> **(D)**　　to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors that § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial

court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

_____

[3]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a

---

variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute."  530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."   542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted).  In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime."   United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)).  The

Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[4]  "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United States v. Ray, 704 F.3d at 1314.  A defendant may assert

_____

[4]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

an error under Apprendi v. New Jersey only where the fact at issue increased his sentence

beyond the statutory maximum.  See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th

Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey

because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson,

No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[5](holding that,

after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be

charged in an indictment and need only be proved to the sentencing judge by a preponderance of

the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the
> United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands
> the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts
> that increase the maximum sentence a defendant faces must be proven to a jury
> beyond a reasonable doubt), to cover facts that increase the mandatory minimum
> sentence, as well as the maximum sentence, it does not prohibit district judges
> from continuing to find advisory sentencing factors by a preponderance of the
> evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
> 4347131, at *22-26[ (D.N.M. Aug. 29, 2014)(Browning, J.)].

---

[5]United States v. Hendickson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See
10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that United States v. Hendrickson; United States v. Schmidt, 353 F. App'x 132 (10th
Cir. 2009)(unpublished);  United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)
(unpublished); United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished); United
States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762 (10th Cir. Jan. 12, 1999)(table
opinion)(unpublished), and United States v. Fread, 73 F.3d 374 (10th Cir. 1995)(table opinion)
(unpublished), have persuasive value with respect to material issues, and will assist the Court in
its preparation of this Memorandum Opinion and Order.

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, Application Note 1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

**(1)**   **(A)**   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

    **(B)**   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

    that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)**     solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)**     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)**     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. The defendant in Witte v. United States had been involved in an

unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana. See 515 U.S. at 392-93. In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's 1991 attempt to import narcotics. See 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities. See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. See 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution provides. See 515 U.S. at 395. The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994). In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question. See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the United States establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background,

character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a

sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the

court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the Guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if a preponderance of the evidence establishes that the defendant committed the more serious crime); United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession Guidelines after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

## RELEVANT LAW REGARDING U.S.S.G. § 3B1.3

Section 3B1.3 of the United States Sentencing Guidelines, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.  If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role);

- 26 -

if this adjustment is based solely on the use of a special skill, it may not be
employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3. Section 3B1.3's "'primary concern . . . is to penalize defendants who take

advantage of a position that provides them freedom to commit or conceal a difficult-to-detect

wrong.'"  United States v. Guidry, 199 F.3d 1150, 1159 (10th Cir. 1999)(quoting United States

v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996)).

   **1.     Abuse-of-Trust Enhancement.**

       To establish abuse of a position of trust for purposes of § 3B1.3's 2-level upward

adjustment, the government must establish: (i) "the person occupies a position of trust," and

(ii) "the position of trust was used to facilitate significantly the commission or concealment of

the crime."  United States v. Spear, 491 F.3d 1150, 1153 (10th Cir. 2007)(citing United States v.

Morris, 286 F.3d 1291, 1295 (11th Cir. 2002)).  The Sentencing Guidelines' Application Note 1

to § 3B1.3 provides the definition for a position of trust:

> "Public or private trust" refers to a position of public or private trust characterized
> by professional or managerial discretion (i.e., substantial discretionary judgment
> that is ordinarily given considerable deference).  Persons holding such positions
> ordinarily are subject to significantly less supervision than employees whose
> responsibilities are primarily non-discretionary in nature.  For this adjustment to
> apply, the position of public or private trust must have contributed in some
> significant way to facilitating the commission or concealment of the offense (e.g.,
> by making the detection of the offense or the defendant's responsibility for the
> offense more difficult).

U.S.S.G. § 3B1.3, Application Note 1.  The Tenth Circuit has noted: "Our cases interpreting the

guideline make clear that the term 'position of trust' is a bit of a misnomer.  It actually has little

to do with trustworthiness and everything to do with authority and discretion."  United States v.

Spear, 491 F.3d at 1154 (emphases in original).

       The first prong of 3B1.3's abuse-of-trust enhancement test analyzes whether the person

occupies a position of trust in relation to the offense's victim.  The Tenth Circuit has noted that

"[t]he question of whether an individual occupied a position of trust is evaluated from the victim's perspective."  United States v. Guidry, 199 F.3d at 1160.  Thus, "the position of trust must be found in relation to the victim of the offense."   United States v. Guidry, 199 F.3d at 1160.  The Tenth Circuit has stated:

> We have applied § 3B1.3 in two types of cases: "The first is where the defendant steals from his employer, using his position in the company to facilitate the offense," and the "second is where a 'fiduciary or personal trust relationship exists' with other entities [not the employer], and the defendant takes advantage of the relationship to perpetrate or conceal the offense."

United States v. Guidry, 199 F.3d at 1160 (alterations in United States v. Guidry but not in source)(quoting United States v. Brunson, 54 F.3d 673, 677 (10th Cir. 1995)).  See United States v. Brunson, 54 F.3d at 677  ("In the typical case where § 3B1.3 applies, the victim is a business and the defendant is an employee who has taken advantage of the knowledge and responsibilities acquired by virtue of his or her position within the company to embezzle or otherwise steal from the company.").

The Tenth Circuit's decision in United States v. Queen, 4 F.3d 925 (10th Cir. 1993), is instructive on analyzing "whether an individual occupies a position of trust . . . from the perspective of the victim."  4 F.3d at 929.  In United States v. Queen, the defendant was the president of Queen Metals Exchange, Inc., a corporation which mailed postcards to individuals advertising itself as a brokerage firm specializing in precious metal and currency accounts.  4 F.3d at 926.  When individuals would inquire about investing with Queen Metals, a company representative would represent that investors' money would be used to purchase precious metals and currencies, that investors would receive a return between 43% and 89% annually, that they would not lose money the first year, and that QMX did not engage in futures and options trading.  See 4 F.3d at 926.  In reality, little of the investors' money was used to purchase metals and

currencies; rather, "a majority of investors' funds were either dissipated in the commodity future's market or used for the defendant's own personal expenses."  4 F.3d at 926.   The defendant pled guilty to wire fraud, and, at the sentencing hearing, the district court rejected the government's suggested offense level and instead adopted the USPO's recommendation for a 2-level upward adjustment under U.S.S.G. § 3.B1.3 based on the defendant's abuse of a position of trust, "because of the existence of a fiduciary relationship between Mr. Queen and his investors." 4 F.3d at 927 (alterations omitted)(internal quotation marks omitted).  The defendant argued that he did not occupy a position of trust.  He asserted that "§ 3B1.3 only applies to individuals who occupy real positions of employment within a business or organization that give rise to relationships of trust," and "that he did not occupy a real position of trust because his asserted status as an investment advisor/broker was part of the fraudulent misrepresentations he made to his victims."  4 F.3d at 928.  The Tenth Circuit noted that "[t]here is no question that, had the defendant actually been an investment advisor/broker as he represented to his victims, he would have occupied a position of trust under" the § 3B1.3 abuse-of-trust analysis at the time that the Tenth Circuit decided United States v. Queen, as it compared a defendant's duties with other employees.  4 F.3d at 929.  The test analyzed

> the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

4 F.3d at 928-29 (quoting United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992)).  The Tenth Circuit reasoned that, because United States v. Williams was concerned with "penalizing defendants who take advantage of a position that provides them with the freedom to commit a

difficult-to-detect wrong," the focus should be on whether the victim believes that the defendant

holds such a position, rather than whether the defendant is actually employed in the position:

> In <u>Williams</u>, we indicated that a primary concern of § 3B1.3 is with penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong.  See also, [<u>United States v. ]Fox</u>, 999 F.2d 483, 486 [(10th Cir. 1993)]; <u>United States v. Lieberman</u>, 971 F.2d 989, 993 (3rd Cir. 1992)("[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.")(quoting <u>United States v. Hill</u>, 915 F.2d 502, 506 (9th Cir. 1990)).  This focus suggests that the question of whether an individual occupies a position of trust should be addressed from the perspective of the victim. <u>See United States v. Booth</u>, 996 F.2d 1395, 1396 (2d Cir. 1993); <u>United States v. Castagnet</u>, 936 F.2d 57, 62 (2d Cir. 1991); <u>United States v. Hill</u>, 915 F.2d 502, 506 n.3 (9th Cir. 1990).  A defendant who convinces a third party that he occupies a formal position of trust may possess the same freedom to commit a difficult-to-detect crime as an individual who actually possesses such a position.  Indeed, in many situations the absence of an institutional constraints may provide a defendant who merely pretends to occupy a formal position of trust with even greater freedom to commit a difficult-to-detect wrong than his or her legitimate counterpart.

<u>United States v. Queen</u>, 4 F.3d at 929.

While <u>United States v. Queen</u> provides insight into how to analyze whether the defendant

holds a position of trust from the victim's perspective, the Tenth Circuit has not defined the

victim for § 3B1.3's purposes:

> The question of how broadly or narrowly the term "victim" should be defined in relation to the position of trust held by the defendant was not raised at any point in this case.  Thus, we do not address the issue except to observe that it is a matter of dispute among the circuits.

<u>United States v. Edwards</u>, 325 F.3d 1184, 1188 n.1 (10th Cir. 2003)(citing <u>United States v. Guidry</u>, 199 F.3d at 1160 n.6 (discussing cases)). At the least, the victim applies to individuals,

<u>see e.g.</u>, <u>United States v. Queen</u>, 4 F.3d at 929, and to "entities" or businesses, <u>e.g.</u>, <u>United States v. Brunson</u>, 54 F.3d at 677.

2.     **Special Skill Enhancement**.

To apply § 3B1.3's enhancement for use of a special skill: "(i) the defendant must possess a special skill . . . ; and (ii) the defendant must use that skill . . . to significantly facilitate the commission or concealment of the offense."  United States v. Tilga, 824 F. Supp. 2d 1295, 1335 (D.N.M. 2011)(Browning, J.)(citing United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998)).  See United States v. Gandy, 36 F.3d 912, 916 n.2 (10th Cir. 1994)(stating that, for § 3B1.3's application to apply based on use of a special skill, "it must be shown not only that Defendant possessed a special skill, but also that he employed that special skill to facilitate the commission of his offense").  Application Note 4 defines special skill as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3, Application Note 4.  The Tenth Circuit recognizes that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill."  United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762, at *3 (10th Cir. Jan. 12, 1999)(unpublished)(table opinion).  "A special skill may also come from experience or from self-teaching."  United States v. Tilga, 824 F. Supp. 2d at 1317 (citing United States v. Gandy, 36 F.3d at 914).  To apply a § 3B1.3 enhancement, the skill "'must be more than the mere ability to commit the offense. . . .  Nothing in the commentary suggests that § 3B1.3 applies to a criminal who . . . bones up on the tricks of his trade and becomes adept at committing a crime that the general public does not know how to commit.'"  United States v. Burt, 134 F.3d at 999 (quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991)).  Additionally, there must be a "connection between the crime and the Defendant's special knowledge."  United States v. Burt, 134 F.3d at 1000.

In United States v. Tilga, a husband and wife -- Tilga and Chandler -- pled guilty to conspiring to impede the tax laws' administration by using multiple overseas trusts, which they purchased at special instructional seminars, to manage the wife's internet business, the couple's homes, and their vehicles, and to evade reporting the family's income to the Internal Revenue Service.  See 824 F. Supp. 2d at 1299.  The Court noted that the presentence investigation report in that case "suggest[ed] that Tilga possessed two sets of special skills that she brought to bear in the commission of her offense: (i) business skills acquired in the course of her education; and (ii) skills related to [the use of the overseas trusts] acquired during . . . seminars."  824 F. Supp. 2d at 1335.  With regard to the business skills acquired during her education, including a bachelor's degree in Hotel Administration from Cornell University and a Master's in Business Administration from the Wharton Business School at the University of Pennsylvania, the Court concluded that there was an insufficient nexus between her business skills and the tax evasion: "The skills she acquired over the course of her education . . . were not tax specific, and related to marketing and collecting fees for services provided.  There is no evidence that Tilga used the business and marketing skills that she acquired during her education to significantly facilitate the concealment of her crime."  824 F. Supp. 2d at 1335 (internal citations omitted).  As to whether the skills acquired at the seminars were "special skills" within § 3B1.2's purview, the Court concluded that, "even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime," reasoning that the company which provided the instructional seminars "exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program."  824 F. Supp. 2d at 1336.  The Court noted that, "generally, attending a few seminars would not appear to be comparable to a skill requiring 'substantial education, training or licensing,'" 824 F. Supp. 2d at 1335 (emphasis in original)(quoting

U.S.S.G. § 3B1.3, Application Note 4), and reasoned that the couple did not use any special skills beyond those that any member of the public attending these seminars and purchasing the trusts would have acquired:

> At the hearing, Chandler stated that "CTC held Tilga's hand throughout the time period" and was involved in the administration of Tilga's trusts.[6]  Tilga also asserts that she accepted the representations of CTC's sales personnel, lawyers, and accountants, and did no more than purchase CTC products.  CTC conducted seminars on a variety of topics, including the "use of trustee documents, privacy issues, offshore banking, certificate holder issues, how to wire transactions to offshore accounts and where to store documents."   While these seminar topics conveyed specialized knowledge, there is no evidence that participants were taught specialized skills not possessed by members of the general public, as

---

[6]CTC is an abbreviation for the Commonwealth Trust Company.  The Court explained in its decision: "The CTC was an organization that taught individuals how to purchase and manage Pure Trust Organizations ('PTOs')."  United States v. Tilga, 824 F. Supp. 2d at 1300.  With regard to PTOs, the Court noted:

> The PSR notes:

>> A Pure Trust Organization (PTO) has been defined as a common law contract in trust form.  The Pure Trust is a contract at common-law in equity created in trust form.  Unlike the Trust, the PTO receives the assets by exchange, meaning there is a full and adequate exchange for the assets.  In other words each party gives something and receives something in return, and the agreement has a stipulated duty to perform that all parties must adhere to.  The Exchanger exchanges the assets to the Trust for Trust Certificate Units ("TCU's").  The Creator appoints at least two Trustees to manage the trust.  The Trustees can appoint a General Manager to oversee the day-to-day business activities of the Trust.  The Exchanger has no control over the Trustees, the business of the Trust or the income stream.  The Trustees are in total control and the Exchanger has no reversionary interest in the Trust.  This entity has the substance of a contract and the form of a trust.

> Tilga PSR ¶ 10, at 7-8.  The IRS states that the term "pure trust" does not appear in the Internal Revenue Code and that "[w]hatever the name of the arrangement . . . the taxation of the entity must comply with the requirements of the Internal Revenue Code."  Abusive Trust Tax Evasion Schemes-Special Types of Trusts, Internal Revenue Service . . . .

824 F. Supp. 2d at 1300 n.7.

§ 3B1.3 requires.   More likely is that participants walked away from these seminars with a general understanding of the topic, which may be more than what the public knows, but which still does not rise to the level of a specialized skill. Although Tilga and Chandler used sophisticated programs, offshore accounts, and other entities, as discussed above in reference to the sophisticated-means enhancement, there is no evidence that Tilga or Chandler possessed any special skills related to the creation or operation of the PTOs.   Furthermore, even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime, because CTC exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program.

824 F. Supp. 2d at 1335-36 (internal references omitted).

The Tenth Circuit, in United States v. Gandy, remanded the case to the district court, concluding that the district court failed to adequately explain the nexus between the defendant doctor's special skill and how the special skill facilitated the offense -- fraudulently stating on Medicare forms that he performed surgery when, in reality, the services were routine foot care services.   See 36 F.3d at 912.   The Tenth Circuit recognized that, "[i]f the government does not show that the defendant employed his skill to facilitate the commission of his offense, then the court may not properly enhance the defendant's sentence under § 3B1.3."   36 F.3d at 915.   The Tenth Circuit "first note[d] that the fact that Defendant possessed a special skill -- podiatry -- is undisputed."   36 F.3d at 915.   The Tenth Circuit also noted that the doctor "used his podiatric skill to defraud the United States.   If he hadn't had [this special skill of podiatry] no fraud could have been committed by him."   36 F.3d at 915 (quoting the trial record).   The Tenth Circuit concluded, however, that the district court's conclusion, without explaining how the "Defendant did in fact use his podiatric skill to facilitate the commission of his offense," was insufficient.   36 F.3d at 915.   Similar to the Court's conclusion in United States v. Tilga that there not a sufficient nexus between any specialized skills the defendant may have garnered through her education in marketing and the tax evasion scheme for which she was convicted, the Tenth Circuit noted: "[Nevertheless,] the court's finding [nor anything in the record] . . . specifically explain how

Defendant used his podiatric skill -- i.e., such as if Defendant had used his diagnostic skills as a podiatrist in some way to falsify the claim forms and the operative reports." United States v. Gandy, 36 F.3d at 916 (internal footnote omitted). The Tenth Circuit pointed out that possession of a special skill without more is insufficient for § 3B1.3's enhancement:

> We note that the court's finding is problematic for another reason. The court's statement that "[i]f [Defendant] hadn't had [his skill] no fraud could have been committed by him," seems to suggest that because Defendant is a podiatrist, *a fortiori* he used his special skill in the commission of his offense. As we have already explained, however, it must be shown not only that Defendant possessed a special skill, but also that he employed that special skill to facilitate the commission of his offense.

United States v. Gandy, 36 F.3d at 916 n.2 (alterations in original).

## LAW REGARDING U.S.S.G. § 3C1.1

Section 3C1.1 states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The application notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, Application Note 1.

The application notes to § 3C1.1 provide a non-exhaustive list of conduct that warrants the upward adjustment. See U.S.S.G. § 3C1.1, Application Note 4.

> **4.**      **Examples of Covered Conduct. --** The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:

**(A)**   threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

**(B)**   committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

**(C)**   producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

**(D)**   destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . .

**(E)**   escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

**(F)**   providing materially false information to a judge or magistrate judge;

**(G)**   providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

**(H)**   providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

**(I)**   other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);

**(J)**   failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. 853(p);

**(K)**   threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

U.S.S.G. § 3C1.1, Application Note 4.

The application note also lists a number of acts that do not normally trigger the enhancement.

> **5.      Examples of Conduct Ordinarily Not Covered.** -- Some types of conduct ordinarily do not warrant application of this adjustment, but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., § 3E1.1 (Acceptance of Responsibility)). . . .
>
> The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:
>
> > **(A)**      providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;
> >
> > **(B)**      making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;
> >
> > **(C)**      providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;
> >
> > **(D)**      avoiding or fleeing from arrest (see, however, § 3C1.2) (Reckless Endangerment During Flight);
> >
> > **(E)**      lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).

U.S.S.G. § 3C1.1, Application Note 5.

In United States v. Farnsworth, 92 F.3d 1001 (10th Cir.1996), the Tenth Circuit recognized that an attempt to influence a witness by instructing the witness to lie warrants an enhancement under § 3C1.1.  See 92 F.3d at 1011.  The Tenth Circuit remanded the case to the

district court, however, because the district court did not make a specific finding as to the issue, instead doing no more than adopting "the analysis of the Probation Department as accurate and correct."  United States v. Farnsworth, 92 F.3d at 1011.  In United States v. Yuselew, No. CR 09-1035 JB, 2010 WL 3834418 (D.N.M. Aug. 5, 2010)(Browning, J.), the Court held that, "to warrant application of the § 3C1.1 enhancement, the defendant must have deliberately -- not accidentally, incidentally, or mistakenly -- done some act with the specific purpose of thwarting the investigation and prosecution."  2010 WL 3834418, at *12.  The Court also found that attempts to obstruct justice may be sufficient if the acts were of a kind that were likely to thwart the investigation and eventual prosecution.  See United States v. Yuselew, 2010 WL 3834418, at *13.

## RELEVANT LAW REGARING LOSS CALCULATION UNDER U.S.S.G. § 2B1.1

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  U.S.S.G. § 2B1.1.  Part of a court's duty when sentencing under § 2B1.1 is to determine whether a defendant's base offense level should be increased because of the amount of loss the offense caused.  See U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows . . . .").  "The court need only make  reasonable estimate of the loss."  U.S.S.G. § 2B1.1, Application Note 3(C).  The Sentencing Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused.  See United States v. Erpenbeck, 532 F.3d 423, 433 (6th Cir. 2008)(rejecting a defendant's argument that the entire value of collateral that he pledged for

a legitimate loan should be used to off-set his fraudulent transactions and holding that the collateral should be reduced pro-rata based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.SG. § 2B1.1, Application Note 3(A)(i).  "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  "Offense" within the definition of either actual or intended loss refers to a defendant's relevant conduct, as determined by § 1B1.3.  See United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction "it does so explicitly" (quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intended for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types").  Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is

limited to those losses "foreseeable to a reasonable person." Guidelines Handbook § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence.  See Guidelines Handbook § 14, at 353. The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012).  Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)).  For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a New Mexico Corrections Department facilities manager awarded four million dollars' worth of state government contracts to a developer in exchange for bribes, the United States submitted no evidence regarding the profit, if any, the developer received from the contracts.  See 2012 WL 2574814, at *1, *9-10.  The Court noted that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1).  2012 WL 2574814, at *10.

The application notes to § 2B1.1 provide that a court shall reduce the loss by certain credits.  First, the court shall reduce the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1, Application Note 3(E)(i).  "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'"  United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011)(quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010))(emphasis in United States Snow but not in United States v. James)(internal quotation marks omitted).  See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he Guidelines permit a reduction for restoring victims' losses prior to the onset of any government involvement, . . . not . . . when payments are not returned to the victims until after the crime has been discovered by the government and the defendant has . . . motivation to use his ill-gotten gains as leverage . . . .").  The application notes indicate that value returned should be credited against the losses that the victim who received the value suffered, and not against a lump sum of total losses where there are more than one victims: for example, in a case involving a Ponzi or other fraudulent investment scheme, value which one investor receives in excess of that investor's principal investment "shall not be used to offset the loss to another individual investor in the scheme."  U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

Second, the court shall reduce the loss, in "a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral," or if the collateral has not been disposed of by sentencing, "the fair market value of the collateral at the time of sentencing."  U.S.S.G. § 2B1.1, Application Note 3(E)(ii).  As the Tenth Circuit has explained, "actual loss should be measured

by the net value, not the gross value, of what was taken when the defendant pledged collateral to secure a fraudulent loan." United States v. Snow, 663 F.3d at 1161. "Where a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan." United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011)(citing United States v. James, 592 F.3d at 1114). Collateral may not be used to offset losses, however, if the defendant "'intended to permanently deprive the creditor of the collateral through concealment.'" United States v. Schild, 269 F.3d 1198, 1201-02 (10th Cir. 2011)(quoting United States v. Nichols, 229 F.3d 975, 979 (10th Cir. 2000)(holding that a defendant convicted of bank fraud may not receive an offset to the loss his offense incurred based on the cattle he pledged as collateral where he sold the cattle, and, thus, the bank could not levy thereon). Additionally, Application Note 3(E)(ii) "cannot reasonably be interpreted as limiting credits to collateral for which the defendant is himself the pledger"; rather, collateral pledged reduces a victim's losses irrespective of which defendant, if there are multiple, pledged the collateral. Guidelines Handbook § 10, at 345 ("The bank suffered only one actual financial loss arising from the concerted action of the two defendants -- a loss objectively measurable by subtracting the value of the collateral from the amount of the loan."). "A court may properly accept a variety of kinds of evidence about the value of the collateral pledged by the defendant, and it need not determine that value to the penny." Guidelines Handbook § 14, at 353.

## ANALYSIS

The Court will overrule the Objections in part and sustain them in part. The United States has not presented sufficient evidence that Welbig intended to steal the $50,000.00 check, and the Court will not consider the check in its loss calculation. Because Welbig used his accounting skills in carrying out his scheme, the Court will apply the special-skills enhancement.

Additionally, fleeing and avoiding arrest do not constitute obstruction-of-justice, and the Court will not apply that enhancement.

## I.   THE COURT WILL NOT CONSIDER THE $50,000.00 CHECK IN THE LOSS CALCULATION.

The Court will not consider the $50,000.00 check in the loss calculation.  Section 2B1.1 increases a defendants' offense level, depending on the amount of monetary loss involved in the case.  Of relevance here, if the loss is more than $30,000.00, the base offense level is increased 6 levels; while if the loss is more than $70,000.00, it is increased 8 levels.  See U.S.S.G. § 2B1.1(b)(1)(D), (E).  Total loss includes "the greater of actual loss of intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A).  "[I]ntended loss means a loss the defendant *purposely* sought to inflict."  United States v. Manatau, 647 F.3d 1048, 1050 (10th Cir. 2011)(emphasis in original). The mens rea for intended loss, thus, requires an inquiry into a defendant's purpose.  See United States v. Manatau, 647 F.3d at 1056.  Therefore, if Welbig intended to steal the $50,000.00, even though unsuccessful, his total loss will be over $80,000.00; on the other hand, if he did not intend to steal the $50,000.00, the $50,000.00 check is not included in the loss calculation, and his total loss is $35,904.67.

The United States has the burden of proving loss by a preponderance of the evidence. See United States v. Kieffer, 681 F.3d at 1168.  Here, the United States states in the U.S. Memo. that it cannot show by a preponderance of the evidence that Welbig intended to steal the $50,000.00.  See U.S. Memo. at 7.  The Court is hesitant to apply the enhancement when the United States concedes that it fails to meet its burden.  Welbig attempted to open a brokerage account without authority to do so.  See PSR ¶ 7, at 3.  The Addendum fleshes out the specifics of this transaction, but it still boils down to Welbig attempting to open a brokerage account using CQG's funds.  See Addendum at 2-3.  There is no indication in the record whether Welbig

intended to keep the $50,000.00 or whether he intended to use it to trade commodities for CQG's benefit.  Welbig may have concluded that his tax-refund scheme was taking too long and generating too little cash, so he decided to try a different scheme.  He also may have decided to curry favor in the company by intentionally exceeding his authority to generate a profit for CQG.  Additionally, he may have mistakenly believed that he had the authority to open such an account.  Simply put, the Court does not know.  There is insufficient evidence one way or another for the Court to determine for what purpose Welbig attempted to open the account.  Because the Court cannot conclude by a preponderance of the evidence that Welbig intended to steal the $50,000.00, it will sustain Welbig's objection and exclude that amount from the total loss calculation.

## II.  WELBIG USED HIS SPECIAL SKILLS TO ENACT HIS SCHEME.

Welbig used his special skills to enact his scheme.  Section 3B1.3 provides a 2-level enhancement for using a special skill. The United States must prove two elements: (i) the defendant possessed a special skill or a position of trust; and (ii) the defendant used that skill or abused that position to significantly facilitate the commission or concealment of the offense.  See United States v. Burt, 134 F.3d at 998-99.   The United States has satisfied both of these elements.

First, Welbig possessed a special skill, specifically he was a certified public accountant. Application Note 4 states that a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," and gives specific examples, including "pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3 Application Note 4.  Additionally, several courts have relied on Application Note 4 to hold that accountants possess special skills.  See, e.g., United States v.

Sarno, 73 F.3d 1470, 1501 (9th Cir. 1995); United States v. Dubin, 91 F.3d 155 (9th Cir. 1996);

United States v. Covey, 232 F.3d 641, 647 (8th Cir. 2000).   As a CPA, Welbig possesses a

special skill, and the United States, this, satisfies the first element.

Second, Welbig used his accounting skills to facilitate the commission and concealment

of his offense.   The Addendum lays out the way in which Welbig used his special skills to

commit and conceal his fraud.   See Addendum at 3-4.   In 1989, Welbig sent the state of Illinois

two tax-voucher forms with checks.   See Addendum at 4.   Each voucher form contained

Welbig's information.   See Addendum at 4.   In January, 1990, Welbig sent Illinois a tax form

indicating no income by CQG and requesting a return of $5,000.   See Addendum at 4.   This tax

form included a U.S. 1040, and a Schedule A, B, and E, all of which were required to complete

the refund request.   See Addendum at 4.   Illinois issued a $5,000 check and mailed it to Welbig.

See Addendum at 4.   The IDR's Legal Division focuses on information provided in the Form

1040-ES and not on the source of the payment, so less attention is provided to the payee in

comparison with the original funds provided.   See Addendum at 4.   California and New York

follow similar processes.   See Addendum at 4.

Welbig's special knowledge of state tax laws, procedures, and systems allowed him to

take advantage of the reimbursement process, and to have the checks issued and mailed to him

without raising suspicion. He knew what documents to attach to the tax form to receive the

refund.  Without that knowledge and skill, his scheme would have failed.   Additionally, Welbig

used his special skills to avoid raising suspicion.  See United States v. Jaradat, 512 F. App'x 612,

615-16 (7th Cir. 2013)(unpublished)(applying special skill enhancement when accountant used

skills to provide phony tax documents in a way that avoided suspicion into her mortgage-fraud

scheme); United States v. Downing, 297 F.3d 52, 65 (2d Cir. 2002)(applying special skill

enhancement when accountants used their expertise to issue false audit reports to help divert suspicion from their stock-manipulation scheme).  The IDR gives less attention to the source of payment than the information on the Form 1040-ES.  See Addendum at 4.  Being a CPA, Welbig likely knew this.  He, thus, knew that, even though CQG made the initial payment and he received the refund, his actions would not alert the IDR to his wrongdoing.

Welbig argues that his scheme was simple and straightforward, and that any CQG employee could have done it.  See Motion ¶ 10, at 3.  He contends that his scheme "did not require any special skill, such as a CPA degree or license."  Motion ¶ 10, at 3.  Welbig's argument misses the mark and ignores § 3B1.3's plain language.  Section 3B1.3 applies to a defendant who "use[s] a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3 (emphasis added).  Section 3B1.3 only requires the defendant to use his or her special skill in the commission or concealment of the offense; it does not require the offense to be of such a nature that a special skill is necessary.  The United States Court of Appeals for the Eighth Circuit has stated: "The legal question is not whether the task could be performed by a person without special skills, but whether the defendant's special skills aided him in performing the task."  United States v. Covey, 232 F.3d 641, 647 (8th Cir. 2000).  It is irrelevant whether a non-CPA could have pulled off Welbig's scheme.  Because Welbig used his accounting skills to commit and conceal his offense, § 3B1.3 applies, and the Court will overrule his objection.

### III.   WELBIG DID NOT OBSTRUCT JUSTICE.

Welbig did not obstruct justice.  Welbig's obstruction-of-justice enhancement is based on him running from the law and using aliases for over twenty years, which caused the FBI to

expend resources in attempting to apprehend him.  See PSR ¶¶ 34-35, at 12-13.  Such a basis, however, is insufficient for the enhancement's application.

Application Note 5 to § 3C1.1 states that "avoiding or fleeing from arrest" does not "ordinarily" warrant the enhancement's application.  U.S.S.G. § 3C1.1, Application Note 5(D).  Thus, merely taking steps to avoid detection and to avoid arrest are ordinarily insufficient to obstruct justice.  As the Tenth Circuit has held, "the 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest." United States v. Fread, 73 F.3d 374, at *4 (10th Cir. 1995)(table opinion)(unpublished)(quoting United States v. Alpert, 28 F.3d 1104, 1107 (11th Cir. 1994) (reversing district court's application of the obstruction-of-justice enhancement when the defendants moved states and adopted aliases)).  Here, Welbig did more than simply disappear.  He also took affirmative steps to avoid detection, including stealing another person's identity and assuming a new name, date of birth, Social Security number, and identification card and moving to a different state.  See PSR ¶ 35, at 13.  The question is, thus, whether Welbig's affirmative steps to avoid detection are sufficient to warrant the enhancement's application.

Several Circuit Courts have held that running from law enforcement and taking affirmative steps to avoid detection are insufficient to warrant the enhancement's application.  In United States v. Stites, 56 F.3d 1020 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit reversed the district court's application of the obstruction enhancement when the defendant fled the jurisdiction, assumed an alias, and went into hiding.  See 56 F.3d at 1026.  There, while being investigated, but before being indicted, the defendant fled the State of California.  See 56 F.3d at 1022.  He also used multiple aliases while in hiding.  See 56 F.3d at 1026.  The Ninth Circuit reversed the district court's application of the enhancement, by

holding that "flight by itself is not an obstruction of justice." 56 F.3d at 1026. It held that the defendant's "purpose in remaining away" -- to avoid being caught -- "did not aggravate his flight; and his aliases did not prevent his apprehension." 56 F.3d at 1026.

Similarly, in United States v. Alpert, the United States Court of Appeals for the Eleventh Circuit held that the defendants moving to another state without telling the authorities and using aliases did not constitute obstruction. See 28 F.3d at 1107. It held that "the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more." 28 F.3d at 1107. The Eleventh Circuit stated that the defendants "may have engaged in *additional* conduct while avoiding arrest, however, that would warrant application of the obstruction enhancement, particularly if that conduct significantly hindered the investigation or prosecution of their offenses." 28 F.3d at 1107 (emphasis in original). The Eleventh Circuit noted that certain conduct requires a showing that the defendant significantly obstructed or impeded an investigation or obstruction -- such as providing a false statement to a law enforcement officer. See 28 F.3d at 1107-08 (citing U.S.S.G. § 3C1.1, Application Notes 4 & 5). The Eleventh Circuit held that the district court erred in inferring that the defendants' conduct of moving to another state hindered or impeded an investigation or prosecution without an actual finding of hindrance or impediment. See 28 F.3d at 1108.

In United States v. Bliss, 430 F.3d 640 (2d Cir. 2005), the United States Court of Appeals for the Second Circuit held that the enhancement did not apply when the defendant moved to a different state, assumed an alias, and changed his appearance. See 430 F.3d at 649-51. There, the defendant sexually abused his nine-year-old niece, videotaped the abuse, and uploaded the videos onto a computer. See 430 F.3d at 642. The police received a tip about the abuse,

interviewed the niece, and conducted a search warrant of the defendant's home, during which they confiscated his camera and computer.  See 430 F.3d at 642-43.  When the defendant learned about the search, he borrowed his mother's and stepfather's car in Vermont, and drove to Bradley International Airport in Windsor Locks, Connecticut.  See 430 F.3d at 643.  He left the car in a parking lot, rented a car under his own name, and drove across the country to Los Angeles International Airport, where he left the rental car in an airport parking lot.  See 430 F.3d at 643.  The defendant obtained employment in California and initially used his own name; however, he later told his employer that, because of court proceeding on the east coast, he wanted to be paid under a different name.  See 430 F.3d at 643.  The defendant may also have used a different alias to purchase a cellular telephone.  See 430 F.3d at 643.  Additionally, when the defendant was finally arrested over a year later, he had gained weight and grew facial hair. See 430 F.3d at 643.

While the defendant was at large, the FBI launched a major search effort to find him, including placing the defendant on the FBI's Ten Most Wanted List, issuing an Interpol red notice to alert international authorities of the federal arrest warrant, and the FBI's Fugitive Publicity Unit arranged to have the defendant's profile aired on the national television program, "America's Most Wanted."  430 F.3d at 643-44.  The television program resulted in a number of false leads, which the FBI pursued, until the United States Marshal's Fugitive Task Force eventually arrested the defendant in California.  See 430 F.3d at 644.  The defendant pled guilty, and the presentence report, which the district court adopted, recommended that the obstruction-of-justice enhancement be applied, because the defendant took affirmative steps to evade arrest for an extended period of time, including changing his name and relocating to California.  See 430 F.3d at 644-46.

The Second Circuit reversed the district court's application of the obstruction-of-justice enhancement.  See 430 F.3d at 651.  It held that the enhancement requires a showing of obstructive conduct coupled with flight.  See 430 F.3d at 649.  The Second Circuit reasoned: "If misrepresentations made directly to law enforcement officers in the course of the investigation cannot be the basis for an obstruction-of-justice enhancement without a showing of actual prejudice then, *a fortiori,* the use of an alias in mundane affairs ordinarily should not be deemed obstructive without such a showing."  430 F.3d at 649 (citing U.S.S.G. § 3C1.1, Application Note 5(A)-(B)).  It noted that, while the defendant used a false name, the United States did not show that the defendant's "use of an alias 'actually resulted in a significant hindrance to the investigation or prosecution of the instant offense.'"  430 F.3d at 549 (quoting U.S.S.G. § 3C1.1, Application Note 5(A)).  The Second Circuit held that, while the "fruitlessness of law enforcement efforts and the length of time in which a suspect is able to avoid apprehension reflect a 'calculated and deliberate plan to evade the authorities', . . . the failure of law enforcement authorities to apprehend a fugitive cannot fairly be attributed to the fugitive's cunning."  430 F.3d at 549.  It held that, "[a]s a corollary to that rule, . . . we will not accept the length of a fugitive's absence as *prima facie* evidence that he obstructed justice.  There must be some showing that *the defendant's obstructive conduct* resulted in the delay in his apprehension."  430 F.3d at 650 (emphasis in original).  It noted "that the bulk of [the United States'] resources were spent pursuing false leads provided by 'America's Most Wanted' viewers -- not following Bliss on a wild goose chase of his own making."  430 F.3d at 650.

In contrast to the Second, Ninth, and Eleventh Circuits, some Circuit Courts hold that taking affirmative steps to avoid arrest may warrant the enhancement's application, even in the absence of actual obstruction.  In United States v. Nduribe, 703 F.3d 1049 (7th Cir. 2013), the

defendant, a Nigerian living in Chicago, Illinois, learned that the police were closing in on his drug ring, and he called relatives in Nigeria to send him, under an alias, a passport and a plane ticket from New York to Nigeria.  See 703 F.3d at 1050.  His relatives complied, and he flew from New York to Nigeria, and later to Amsterdam.  See 703 F.3d at 1050.  The defendant lived in Amsterdam for several years under different aliases, until he was arrested and extradited to the United States.  See 703 F.3d at 1050.

The United States Court of Appeals for the Seventh Circuit, in an opinion that the Honorable Richard A. Posner, United States Circuit Judge for the Seventh Circuit, authored, and Judges Rovner and Wood joined, affirmed the district court's application of the obstruction-of-justice enhancement.  See 703 F.3d at 1053.  Judge Posner noted that the "avoiding or fleeing arrest" exception was puzzling, because

> [i]f providing a false name or identification document at arrest merits the two-level increase when "such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense," why should avoiding or fleeing from arrest not merit the increase when significant hindrance to the investigation or prosecution of the offense results?

703 F.3d at 1051 (quoting U.S.S.G. § 3C1.1, Application Note 5(A)).  He noted that "[five] years of avoiding arrest through use of alibis and travel to foreign countries are bound to create a significant hindrance to a prosecution."   703 F.3d at 1051.   Contrary to most sentencing enhancements, Judge Posner placed the burden of showing no significant hindrance on the defendant.  See 703 F.3d at 1051 ("If [there is no significant hindrance to a prosecution] -- if for example essential evidence of guilt serendipitously emerges in that period -- the burden of establishing the exception should be the defendant's.").

In construing the limits of the evading-arrest exception, Judge Posner stated that "[t]here's a difference between not making it easier for the police to arrest you and making it harder for them to do so."  703 F.3d at 1051.  Judge Posner, thus, announced the following rule:

> Flight from arrest is obstruction of justice within the meaning of the guideline . . . if it is likely to burden a criminal investigation or prosecution significantly -- likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been, a criterion easily satisfied in this case.  (A defendant's conduct is attempted obstruction if, had it succeeded, it would have had those consequences.)

703 F.3d at 1053.  In distinguishing United States v. Bliss, Judge Posner stated that "[t]he court must have forgotten the phrase '*or attempted* to obstruct or impede' (emphasis added) in the guideline."  703 F.3d at 1053 (quoting U.S.S.G. § 3C1.1).  He held that "[t]he attempt is culpable even if the police are clever and foil it.  If they're not clever and so fail to foil it, that's no reason to exculpate their quarry for having succeeded in obstructing justice."  703 F.3d at 1053.  Judge Posner noted that Application Note 5(D) may be "limited to leaving the scene of an arrest or an attempt at arrest, as distinguished from protracted flight."  703 F.3d at 1051.

The Eight Circuit has similarly held, without announcing as clear of a rule as Judge Posner, that affirmative conduct to avoid arrest may warrant the enhancement's application.  In United States v. Walcott, 61 F.3d 635 (8th Cir. 1995), Internal Revenue Service ("IRS") agents attempted to arrest the defendant, but were unable to do so.  61 F.3d at 637.  The defendant, his family, and his attorney communicated with the IRS agents, yet the defendant refused to surrender.  See 61 F.3d at 637.  The defendant fled from New York to Florida, and, while he used his own name in some situations, he also used aliases for other transactions.  See 61 F.3d at 637.  While on the run, the defendant attempted to change his appearance, including styling his hair with dreadlocks, growing a mustache, and removing a gold front tooth.  See 61 F.3d at 638.  When the IRS agents tracked down the defendant, they, and local police, surrounded the

house and ordered the defendant to surrender, which he did not.  See 61 F.3d at 638.  The agents

used a loud speaker to order him to surrender, shot tear gas into the house to drive him out, and

finally threw flash grenades into the house before storming it.  See 61 F.3d 638.

The Eight Circuit, in an opinion that the Honorable Andrew W. Bogue, Senior United

States District Judge for the District of South Dakota, sitting by designation, authored, and

Judges Wollman and Arnold joined, affirmed the district court's application of the

obstruction-of-justice enhancement.  See 61 F.3d at 639.  Judge Bogue held that the defendant's

conduct "constituted more tha[n] merely avoiding or fleeing from arrest."  61 F.3d at 639.  He

wrote that "[s]ignificant time and resources were required to effectuate [the defendant's]

capture," and that the case's "facts do not present a situation of instinctive fleeing from the scene

of a crime."  61 F.3d at 639.  Judge Bogue stated that the defendant "willfully and deliberately

engaged in conduct over a considerable amount of time calculated to mislead and deceive

authorities."  61 F.3d at 639.  He held that the fleeing-arrest exception's application is not precise

and that a defendant's cumulative conduct may warrant the enhancement's application, even if

his or her individual acts would not.  See 61 F.3d at 639.

> The distinction between merely "avoiding or fleeing from arrest" and obstructing
> justice is somewhat imprecise and courts have generally relied on the facts of the
> particular case to determine when the enhancement is justified.  While individual
> components of Walcott's conduct alone may not constitute obstruction of justice,
> when viewed cumulatively, we conclude the totality of Walcott's conduct
> warranted an enhancement under section 3C1.1.

61 F.3d at 639.

The Court finds the Second, Ninth, and Eleventh Circuits' test more persuasive the

Seventh and Eighth Circuits'.  Additionally, the Court believes that the Tenth Circuit would

likely follow the Second, Ninth, and Eleventh Circuit's direction.  The Tenth Circuit has

consistently held that the United States has the burden of proving by a preponderance of the

evidence sentencing enhancements that increase a defendant's sentence.  See, e.g., United States v. Orr, 567 F.3d 610, 614 (10th Cir. 2009)("The government bears the burden of proving sentencing enhancements by a preponderance of the evidence."); United States v. Tindall, 519 F.3d 1057, 1063 (10th Cir. 2008)("Under well-established Tenth Circuit precedent, the government has the burden of proving sentence enhancements."  (internal quotation marks omitted)(quoting United States v. Campbell, 372 F.3d 1179, 1183 (10th Cir. 2004))).  The Seventh Circuit's test turns this burden on its head by requiring, in cases involving the prolonged evasion of law enforcement, the defendant to prove that his or her conduct did not significantly hinder or impede the investigation or prosecution.  See United States v. Nduribe, 703 F.3d at 1051.  The Seventh Circuit creates a presumption that a defendant's prolonged absence impeded the investigation or prosecution, and then places the burden on the defendant to rebut this presumption.  See United States v. Nduribe, 703 F.3d at 1053.

While Judge Posner is correct in stating that § 3C1.1 applies to obstruction and attempted obstruction, see 703 F.3d at 1053, he does not fully account for several Application Notes which require a showing of actual hindrance.  For example, destroying or concealing evidence contemporaneously with an arrest, "standing alone, [is not] sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender."  U.S.S.G. § 3C1.1, Application Note 4(D).  "[P]roviding a materially false statement to a law enforcement officer" is obstruction only if it "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  U.S.S.G. § 3C1.1, Application Note 4(G).  See U.S.S.G. § 3C1.1, Application Note 5(B) (noting that "making false statements, not under oath, to law enforcement officers" is not obstruction, "unless Application Note 4(G) . . . applies").  Similarly, "providing a false name or

identification document at arrest" is not obstruction "except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense."  U.S.S.G. § 3C1.1, Application Note 5(A).  Other Application Notes, on the other hand, require no such impediment showing.   See, e.g., U.S.S.G. § 3C1.1, Application Note 4(A) (stating that "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is obstruction); U.S.S.G. § 3C1.1, Application Note 4(C) (stating that "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" is obstruction); United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711941, at *43 (D.N.M. Feb. 5, 2015)(Browning, J.)(not requiring the United States to prove hindrance or impediment when the defendant provided a false document during an official investigation).

Judge Posner's focus on § 3C1.1's attempt language is misguided for two reasons.  First, he states that "flight from arrest is obstruction of justice within the meaning of the guideline . . . if it is likely to burden a criminal investigation or prosecution significantly . . . .  A defendant's conduct is attempted obstruction if, had it succeeded, it would have had those consequences." United States v. Nduribe, 703 F.3d at 1053.  If flight were obstruction, then Judge Posner may be correct in stating that attempting flight is also obstruction.  Flight, however, is not obstruction. See U.S.S.G. § 3C1.1, Application Note 5(D).  While attempting to obstruct justice is treated as obstruction, attempting an act that is not obstruction is not.   Second, Judge Posner's rule essentially erases the significant-hindrance requirement.  Judge Posner reasons that flight is obstruction if it significantly hinders a prosecution or investigation by noting that making a material false statement to a police officer or providing a false name at arrest is obstruction if those acts significantly hinder the investigation or prosecution.  See United States v. Nduribe,

703 F.3d at 1051.  He then takes this rule one step further by stating that merely attempting flight that is likely to burden an investigation or prosecution is obstruction.  See United States v. Nduribe, 703 F.3d at 1053.  Applying the attempt language to this rule, however, completely reads out the significant-hindrance requirement.  A defendant who lies to a police officer attempts to significantly hinder an investigation and prosecution, even if his or her lie did not have such a result.  Similarly, a defendant who provides a fake name or identification at arrest attempts to impede the investigation or prosecution.  By applying the attempt rule to conduct that requires significant hindrance, Judge Posner eliminates the significant-hindrance requirement and makes conduct, which the application notes state are not obstruction, into obstruction.

Judge Posner rewrites Application Note 5(D), which states that "avoiding or fleeing arrest" is "ordinarily" not obstruction, to state that "prolonged avoiding or fleeing arrest is obstruction, unless the defendant can show that his or her conduct did not significantly hinder or impede an investigation or prosecution."  This rewriting does not fully account for the Application Note's plain language.  Application Note 5(D) has no temporal requirement.  As the Ninth Circuit held, "Application Note 4(d) [-- now 5(D) --] does not restrict its application to flights of short durations."  United States v. Madera-Gallegos, 945 F.2d 264, 267-68 (9th Cir. 1991).  If it created such a temporal rule, defendants who run immediately -- such as drug dealers, violent offenders, often dangerous people -- would fare better than the person who disappears for long periods, who are often white-collar defendants, and who are not violent.  Moreover, would the rule be that someone has to be gone twenty-four hours, forty-eight hours, a week, ten years?  By not fully appreciating the Application Note's plain language, Judge Posner rewrites an Application Note that says when the enhancement does not apply to say when the enhancement applies and then he crafts an exception to his own new application note.  Unelected

judges should leave such a rewrite to Congress and the United States Sentencing Commission. The Court declines to disregard Application Note 5(D) to follow this judge-made rule.

The Court finds the Second Circuit's rule more persuasive and more in line with the Application Note's language. As the Second Circuit states, it would be odd that the Guidelines require a showing of significant hindrance for providing a false name or identification document at arrest, and for making a material false statement to law enforcement officers, but require no such showing when the defendant makes an indirect false statement through the use of an alias. See United States v. Bliss, 430 F.3d at 649. If blatantly lying to a police officer is not obstruction, unless the United States can show that the lie significantly hindered the investigation or prosecution, see U.S.S.G. § 3C1.1, Application Note 5(B), lying to the world about one's identity also should not be obstruction without requiring the United States to show significant hindrance. A defendant who lies to a police officer's face is more culpable than a defendant who lies to the world and only second-handedly to an officer. That is, by using an alias, a defendant does not deceive law enforcement officers unless the defendant either gives an officer his or her alias, or the officers learn of the alias from a person whom the defendant told.

Moreover, as Application Note 5(D) implies, and as the Ninth Circuit has held, "flight by itself is not an obstruction of justice." United States v. Stites, 56 F.3d at 1026. By stating that "avoiding or fleeing arrest" does not "ordinarily" constitute obstruction, Application Note 5(D) implies that something more than just fleeing is required to warrant the enhancement's application. U.S.S.G. § 3C1.1, Application Note 5(D). The Tenth Circuit, in an unpublished opinion, has said the same. In United States v. Fread, the Tenth Circuit quoted United States v. Alpert, in which the Eleventh Circuit stated that the § "'3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply

disappear to avoid arrest.'"  United States v. Fread, 73 F.3d 374, at *4 (quoting United States v. Alpert, 28 F.3d at 1107).  Simply evading arrest -- i.e., disappearing to avoid arrest -- without more, therefore, does not warrant the enhancement's application.

Because flight, by itself, does not constitute obstruction, a defendant must do something more to warrant the enhancement's application.  The Eleventh Circuit stated, in United States v. Alpert, after finding that the defendants' conduct was not obstruction:  "The [defendants] may have engaged in *additional* conduct while avoiding arrest, however, that would warrant application of the obstruction enhancement, particularly if that conduct significantly hindered the investigation or prosecution of their offenses."  28 F.3d at 1107 (emphasis in original).  The Court agrees.  By stating that fleeing is "ordinarily" not obstruction, Application Note 5(D) indicates that fleeing may be obstruction in some circumstances.  U.S.S.G. § 3C1.1, Application Note 5(D).  The Court believes that these circumstances include when a defendant engages in additional deceptive conduct while fleeing -- such as using an alias -- that significantly hinders an investigation or prosecution.  The enhancement's application is based on the flight and the additional deceptive conduct, and not just on the flight.  The only caveat, however, is that the United States must show that the additional conduct plus the fleeing, and not just the fleeing, hindered the investigation.  The United States has the burden of proving the enhancement's application, see, e.g., United States v. Orr, 567 F.3d at 614, and just fleeing is not obstruction, see U.S.S.G. § 3C1.1, Application Note 5(D).  If a defendant flees to another state, adopts an alias, and is not captured for several years, the United States must show that the defendant adopting an alias in addition to fleeing, and not just the defendant fleeing, caused the delay in

capture.  If the United States does not present evidence[7] showing whether the defendant's fleeing and other conduct hindered the investigation and prosecution, the United States fails to meet its burden and the enhancement does not apply.

The United States may meet its burden in a number of ways.  There are likely a number of transactions or events in which a fugitive may engage that would alert the FBI of his or her location.  For example, an employer may require the fugitive to give his or her name for tax purposes, and the employer may pass the fugitive's name on to the state taxing authority.  The state taxing authority likely has a database containing a list of all employed taxpayers in the state.  The FBI may be alerted to the fugitive's location if the FBI is allowed to regularly check those databases for fugitives or the FBI provides state taxing authorities with names of at-large fugitives for whom to be on the lookout.  By using his or her real name to gain employment, the fugitive may alert the FBI of his or her location via the state taxing authority, and the FBI can then apprehend the fugitive.  If the fugitive uses an alias to gain employment, however, the FBI will not be alerted of his or her location, and the fugitive's use of an alias would hinder the FBI's investigation and delay his or her capture.[8]  Also, if a police officer stops the fugitive, and the officer runs the fugitive's name to see if there is a warrant for his or her arrest, the officer may

---

[7]Because the Court may rely on the PSR at sentencing, the Court is not suggesting that the United States is also required to present additional evidence at the sentencing hearing to meet its burden.  The evidence in the PSR may be sufficient.  If the PSR is not sufficient, however, the United States will need to present additional evidence to satisfy its burden.

[8]The Court is unsure whether state taxing authorities maintain such taxpayer databases, whether the FBI checks these databases, whether the FBI checked these databases in 1991 -- when Welbig first fled -- or whether the FBI provides state taxing authorities with a list of outstanding warrants and state taxing authorities alert the FBI when it discovers that a fugitive paid taxes within the state.  This is information the United States would need to provide the Court.  The United States likely does not need to provide testimony or an affidavit from the FBI agents who initially investigated Welbig's case.  Instead, any FBI agent can likely inform the Court of the FBI's systems and cooperation with state taxing agencies.

alert the FBI of the fugitive's location or may arrest the fugitive on the spot.  If a fugitive has any of these events occur while on the run, and the fugitive's use of an alias allowed him or her to avoid detection, then the Court would find that the use of the alias and flight, and not just the flight, hindered the investigation and prosecution.

Here, Welbig fled the state and assumed an alias to avoid detection.  That, by itself, is insufficient to warrant the enhancement's application.  While Welbig did more than flee and avoid arrest, the United States has not presented any evidence showing that Welbig's other conduct -- specifically, his use of an alias -- in addition to his flight, significantly hindered the prosecution or investigation of his offense.  Over twenty years have passed since the time of Welbig's offense and his apprehension.  This delay may have been caused by his flight -- i.e., moving from state to state -- or it may have been caused by his use of an alias or his flight and use of an alias.  The United States has not presented any evidence showing which conduct caused the delay.  Living on the lam for over twenty years is a significant amount of time, but the Court is unable to find by a preponderance of the evidence that Welbig's flight and use of an alias, and not just his flight, caused this delay.

The PSR states that, because of Welbig's conduct, the FBI expended resources in attempting apprehend him.  See PSR ¶ 35, at 13.  The Court does not, however, know whether the FBI spent significant resources attempting to apprehend Welbig.  Welbig embezzled around $35,000.00.  He is not a dangerously violent criminal and his crime is not exceptional or, compared to most crimes the Court sees, the most serious.  He is a non-violent, white-collar criminal who stole a relatively small amount of money.  It may be that the FBI did not expend an extraordinary amount of resources pursuing his capture.  For example, if a single FBI agent merely called Welbig's ex-wife, once a year, the Court would not think Welbig's fleeing and

assuming an alias hindered the FBI's investigation.   If, on the other hand, the FBI did a nationwide search for John Dolan and could not find him, the flight and alias substantially hindered Welbig's capture.   Here, neither the PSR nor the Addendum puts forth evidence showing that Welbig's actions in fleeing and assuming a new identity significantly hindered the FBI's investigation or the United States' prosecution.   The PSR states that the FBI annually contacted Welbig's family and acquaintances, but it does not say that, if Welbig had not fled and assumed an alias, the FBI would have apprehended him earlier.   Welbig took affirmative avoidance steps, and the FBI did not secure his capture for over twenty years.   There is not, however, any evidence connecting his acts and the failure to capture him.   The most that the Court can say is that Welbig "engaged in criminal activity[,] . . . learn[ed] of an investigation into that activity[,] . . . simply disappear[ed] to avoid arrest," and assumed an alias.   United States v. Fread, 73 F.3d 374, at *4 (internal quotation marks omitted).   Without evidence showing that Welbig's alias significantly hindered the investigation or prosecution, § 3C1.1 does not apply.   The United States has not presented such evidence, and the Court cannot find any.[9]

---

[9]As the Court previously stated, the United States could show obstruction by introducing evidence that, because of the FBI's resources, if Welbig had not fled and adopted an alias, it would have apprehended Welbig.   At the hearing, the United States noted that it was unable to locate the FBI agents who originally investigated the case.   See Tr. at 4:6-10 (Cairns).   The United States does not, however, need the original agents' testimony to meet its burden.   The PSR states that the FBI contacted Welbig's family and acquaintances on an annual basis.   If the FBI continued this practice, as the PSR states it did, one of those present agents may have been able to testify that the FBI would have apprehended Welbig but for his actions.   Furthermore, the United States may have presented testimonial evidence from an FBI agent, who was not connected to the case, who could testify that, because the FBI had a warrant out for Welbig's arrest, and because of the FBI's resources and systems that it has in place, if Welbig used his own identity, the FBI would have apprehended him sooner.   The PSR states that Welbig was arrested for driving under the influence in 1999.   See PSR ¶ 42, at 13-14.   It is likely that, at the time of his arrest, the arresting officers ran the name that Welbig gave them -- John Dolan -- against databases containing outstanding warrants.   If the United States could show that, if Welbig gave the arresting officers his real name, the officers would have been alerted to Welbig's warrant and would have contacted the FBI, the enhancement would apply.   The Court

Accordingly, the Court will sustain Welbig's objection and will not apply the obstruction-of-justice enhancement.

The Court shares Judge Posner's frustrations with the currently written rule, and the Sentencing Commission may want to revisit this Application Note. The Court agrees with Judge Posner that disappearing and the use of an alias almost invariably hinders the police investigation. The current split between the Circuits reminds the Court of the Tenth Circuit's treatment of crimes of violence. Compare United States v. Rodriquez-Enriquez, 518 F.3d 1191, 1193 (10th Cir. 2008)(holding that poising another person is not a crime of violence, because it does not involve a physical, mechanical act), with United States v. Armijo, 651 F.3d 1226, 1230-32 (10th Cir. 2011)(holding that placing a person in fear of being poisoned under a menacing statute qualifies as a crime of violence). Analysis of how to treat fleeing and aliases is beginning to leave reality and enter the world of fantasy to assume that fleeing for twenty years and using an alias did not significantly hinder a police investigation into this crime. If the Sentencing Guidelines were meant to punish relevant conduct, then it should not be making it so difficult to do so. The Court would be inclined to say that fleeing alone is not enough, but any further act -- like the use of an alias -- is as long as police made any reasonably diligent effort to find the defendant.

**IT IS ORDERED** that the Objections to Presentence Report (PSR), filed March 6, 2015 (Doc. 18), are overruled in part and sustained in part. Specifically, the Court sustains Welbig's

---

assumes that, in 1999, such an interagency system was in place and that the Arizona officers would have been alerted to Welbig's warrant. The Court is, however, not sure, and, without evidence so showing, the Court will not assume that such a system was in place and that, if Welbig did not use an alias, he would have been apprehended in 1999. Because there is no evidence on the record showing that Welbig's conduct hindered the FBI's investigation or the United States' prosecution, the Court cannot soundly find by a preponderance of the evidence that the United States met its burden.

objection to the inclusion of the $50,000.00 check in the Court's total loss calculation and his objection to the obstruction-of-justice enhancement.  The Court overrules Welbig's objection to the special skills enhancement.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Norman Cairns
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Stephen P. McCue
   Federal Public Defender
Michael A. Keefe
    Assistant Federal Public Defender
Albuquerque, New Mexico

        *Attorneys for the Defendant*